IN THE UNITED STATES DISTRICT COURT

FILED

FOR THE DISTRICT OF WYOMING

U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 MAR 12 PM 2 01

STEPHAN HARRIS, CLERK
CHEYENNE

| | |
|---|---|
| NORTHERN ARAPAHO TRIBE, on its own behalf and on behalf of its members, and DARREL O'NEAL, Sr., Chairman, Northern Arapaho Business Council, in his official and individual capacities, | |
| Plaintiffs, | Case No. 2:11–CV–00347–ABJ |
| v. | |
| DANIEL M. ASHE, Director, United States Fish and Wildlife Service, and MATT HOGAN, Assistant Regional Director, Region 6, Migratory Birds and State Programs, in their official capacities, | |
| Defendants. | |

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON REMAINING CLAIMS
AND
OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' REMAINING CLAIMS**

---

Plaintiffs' *Motion for Summary Judgment on Remaining Claims* (Doc. No. 78), the

Eastern Shoshone Tribe's *Second Supplement to Eastern Shoshone Tribe* Amicus Curiae *Brief*

(Doc. No. 85), Respondents' *Cross-Motion for Summary Judgment on Plaintiffs' Remaining

Claims* (Doc. No. 86), Plaintiffs' *Opposition to Motion to Strike* (Doc. No. 89), and Plaintiffs'

*Reply Brief* (Doc. No. 90) have come before the Court for consideration. After reviewing the

parties' submissions, the applicable law, and being fully advised, the Court finds that Plaintiffs'

*Motion for Summary Judgment on Remaining Claims* should be **GRANTED IN PART** and **DENIED IN PART** and Defendants' *Cross-Motion for Summary Judgment on Plaintiffs' Remaining Claims* should be **GRANTED IN PART** and **DENIED IN PART** for the reasons stated below.

The Northern Arapaho Tribe ("NAT") and the Chairman of the Northern Arapaho Business Council,[1] Plaintiffs, filed an application for a permit with the U.S. Fish and Wildlife Service ("USFWS" or "Service"), Defendants, to take bald eagles within the Wind River Reservation, pursuant to the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668–668(d). While processing Plaintiffs' permit application, Defendants learned that the Eastern Shoshone Tribe ("EST") objected to the Northern Arapaho Tribe taking eagles within the Wind River Reservation based on cultural and religious grounds. Ultimately, Defendants decided to issue Plaintiffs a permit to take two bald eagles within Wyoming but outside of the Wind River Reservation because doing so "would allow the NAT to take a live eagle for religious purposes in a manner that would avoid . . . burdening the religious and cultural beliefs and practices of the EST." R. at 533.

In the present motion, Plaintiffs challenged Defendants' decision in the informal adjudication of their permit application under the Administrative Procedure Act ("APA") and the Free Exercise Clause of the First Amendment to the United States Constitution. The Court finds

---

[1] When Plaintiffs filed the first permit application, Harvey T. Spoonhunter was the Chairman of the Northern Arapaho Tribe Business Council. R. at 224–30. After submitting the first permit application but before the *Complaint* was filed, Jim Shakespeare replaced Mr. Spoonhunter as Chairman. *See* Docs. No. 1; R. at 669. Mr. Shakespeare was subsequently replaced by Darrell O'Neal. Doc. No. 58.

that Defendants' decision was not arbitrary or capricious under the APA. However, the Court finds that Defendants' decision violated the Free Exercise Clause of the First Amendment.

## BACKGROUND

The Wind River Reservation[2] was created in 1868 when the Eastern Shoshone Tribe and the United States of America entered into a treaty whereby the Eastern Shoshone Tribe "relinquished to the United States a reservation . . . in Colorado, Utah, Idaho, and Wyoming, and accepted in exchange a reservation . . . in Wyoming." *Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States*, 299 U.S. 476, 485 (1937). Ten years later the United States placed the Northern Arapaho Tribe on the Wind River Reservation. *Id.* at 487. As the Tenth Circuit Court of Appeals has noted, "The Northern Arapaho share the Wind River reservation with the Shoshone tribe, a relationship that has not always been amicable." *United States v. Friday*, 525 F.3d 938, 943 (10th Cir. 2008).

In 2005, "Winslow Friday, a member of the Northern Arapaho Tribe of Wyoming, shot a bald eagle [within the Wind River Reservation] for use in the tribe's traditional religious ceremony, the Sun Dance." *Id.* at 942. The BGEPA prohibits the take of bald and golden eagles unless a permit has been issued. As defined in the Code of Federal Regulations, "Take means pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, destroy, molest, or disturb." 50 C.F.R. § 22.3 (2014). Mr. Friday did not have a permit to take the bald eagle and was charged by the United States with violating the BGEPA. *Id.* at 942, 945. Mr. Friday moved to dismiss

---

[2] The reservation created by the Treaty of July 3, 1868 has been called by various names, including "Wind River Reservation," "Wind River Indian Reservation," and "Shoshone Reservation." For purposes of this Order, the Court will refer to reservation as the "Wind River Reservation."

the charges under the Religious Freedom Restoration Act ("RFRA"). *Id.* at 946. The district court granted the motion. *Id.*

The Tenth Circuit Court of Appeals reversed. The Tenth Circuit concluded that BGEPA "and its regulations are the least restrictive means of pursuing the government's compelling interest in preserving the bald eagle." *Id.* at 942. Therefore, the court determined that BGEPA and its regulations do not violate RFRA. *Id.* The Tenth Circuit also noted the following:

> We are not oblivious to the possibility that the government's permit process for the religious taking of eagles may be more accommodating on paper than it is in practice. If so-if the process is improperly restrictive, burdensome, unresponsive or slow-we trust that members of the tribe will not hesitate to vindicate their rights either through petition or in a proper suit. This, however, is not the occasion to consider those issues, because the defendant made no attempt to use the system.

*Id.* at 960.

In response to *Friday*, on October 7, 2009, Plaintiffs submitted an application for a permit with Defendants to take bald eagles within the Wind River Reservation pursuant to the BGEPA. R. at 224–40. Plaintiffs sought to take bald eagles for use in religious ceremonies. *Id.* In permit application section entitled "The State, county, and locality (or reservation) where the collection will occur," Plaintiffs provided "Wyoming, Freemont County, Wind River Indian Reservation." R. at 226.

On January 26, 2010, the Attorney General of the Eastern Shoshone Tribe, Kimberly D. Varilek, wrote a letter to Defendants. The letter voiced the opposition of the Eastern Shoshone Tribe to the take of bald eagles by the Northern Arapaho Tribe within the Wind River

Reservation. R. at 4–41.[3] The letter did not reference any religious or cultural objection on the part of the Eastern Shoshone Tribe. *See id.*

On September 28, 2010, Defendants sent a letter to Plaintiffs notifying them that their application was deficient and requested additional information. *Id.* at 211–14. On October 29, 2010, Plaintiffs sent Defendants a second permit application containing the additional requested information. *Id.* at 233–50. In permit application section entitled "The State, county, and locality (or reservation) where the collection will occur," Plaintiffs again provided "Wyoming, Freemont County, Wind River Indian Reservation." *Id.* at 236.

On December 17, 2010, Defendants notified Plaintiffs that before they could issue a permit, they were required by Executive Order 13175 to consult with the Eastern Shoshone Tribe. *Id.* at 356. On June 8, 2011, Defendants met with the Joint Business Council, consisting of members of both tribes, to discuss the permit application. The minutes of that meeting are not contained within the administrative record.

On November 7, 2011, over two years after Plaintiffs submitted their original permit application, Plaintiffs commenced the present action by filing a *Complaint*. Doc. No. 1. Plaintiffs alleged that "Defendants have failed or refused to issue a federal permit to allow the taking of an eagle by members of the Northern Arapaho Tribe for traditional Native American religious purposes." *Id.*

---

[3] In the copy of the administrative record provided to the Court, pages thirty-five through forty are illegible. The illegible pages are an attachment to the letter and appear to be a copy of the "Constitution and Bylaws for Governing the Indians of the Wind River Reservation, Wyo." R. at 35–40.

On December 6, 2011, A.G. Varilek sent Defendants a second letter. R. at 1042–48. The letter contains two opaque references to the Eastern Shoshone Tribe's cultural or religious objection to the Northern Arapahoe Tribe taking eagles within the Wind River Reservation. *See id.* First, the letter states that "part of inherent tribal sovereignty is a Tribe enacting and consent [sic] laws that will not only govern their tribal members and tribal lands, but should protect all aspects of the Tribe and tribal members' interests, activities, cultural and religious practices." *Id.* at 1047. Second, the letter concludes by stating, "NAT demands respect for its cultural and tribal practices, but must also give respect to the Eastern Shoshone Tribe's tribal and cultural practices . . . ." *Id.* at 1048.

On December 13, 2011, Defendants met with the Eastern Shoshone Business Council. During that meeting, "the Eastern Shoshone Business Council repeated its position that it opposed the take of eagles on the Wind River Reservation because bald eagles are sacred to the EST." *Id.* at 530. Following that meeting, Defendants determined the consultation with the Eastern Shoshone Tribe required by Executive Order 13175 was complete. *Id.*

On December 16, 2011, Wade LeBeau, an enrolled member of the Eastern Shoshone Tribe sent a letter to Defendants. *Id.* at 381–95. Mr. LeBeau stated that "[a]llowing an enemy tribe the right to kill our sacred eagles goes against our traditions, values, morals, heritage, rights, freedoms, and the agreement of the United States." *Id.* at 382. The letter further contends that the Eastern Shoshone Tribe uses the eagle repository "because we are AGAINST killing sacred animals." *Id.* at 384. Mr. LeBeau also stated that if the Northern Arapaho Tribe were allowed to take eagles on the Wind River Reservation

> then the USFWS is imposing, violating, disgracing, infringing, etc. on THOUSANDS of Shoshone people's rights, culture, traditions, beliefs, etc. It is wrong to take Shoshone people's rights away to give them to a tribe that does not

belong here, does not have a treaty to be here, does not have sovereign rights here, and did not reside here for the THOUSANDS of years prior to 1878.

*Id.*

On January 11, 2012, Defendants filed a *Motion for Stay of Proceedings or in the Alternative Extension of Time to File the Administrative Record.* Doc. No. 8. Defendants noted that before they could issue the permit, they were required to consult with the Eastern Shoshone Tribe. *Id.* Defendants asserted in the motion that the consultation with the Eastern Shoshone Tribe was complete, and they intended "to issue a decision on Plaintiffs' application for 'take' of eagles" by March 12, 2012. *Id.* Defendants also requested a sixty day stay to file the administrative record. The Court granted the motion. Doc. No. 13.

On March 9, 2012, Defendants issued a permit that allowed Plaintiffs to take up to two bald eagles between March 9, 2012 and February 28, 2013, but the permit limited the location where the take could occur to "Wyoming, outside exterior boundaries of Wind River Reservation." R. at 671. In the *Findings for Northern Arapahoe Tribe's Permit to Take Bald Eagles for Religious Purposes* ("*Permit Findings*"), Defendants first examined whether the proposed take was compatible with the preservation of eagles. Defendants found that the "proposed take of up to two bald eagles for Indian religious use is within the annual take threshold established by the Service for the Northern Rocky Mountains region." R. at 531. Next, Defendants considered whether the proposed take was for a bona fide religious purpose. Ultimately, Defendants found that "the take of bald eagles by the NAT as proposed in its application is for bona fide religious purposes." *Id.*

Finally, Defendants determined they had to examine "whether the EST's religious beliefs were infringed by granting the permit application" because "the Service cannot make a permit decision without implicating the religious practices of both the NAT and the EST." R. at 532.

Defendants found that "both Tribes share deeply held, but contrary, beliefs about bald eagles and take." R. at 532. In making the permit decision, Defendant's relied on the general interest in fostering and protecting the culture and religion of federally-recognized Indian tribes as expressed by the Tenth Circuit—"[I]n furthering its interest in protecting Native American religions and cultures, the Service must consider two competing interests: protecting NAT religion and culture while at the same time protecting EST religion and culture." *Id.* Defendants examined the possibility of granting the Northern Arapaho Tribe a permit that excluded the Wind River Reservation from the area where the take could occur. Defendants noted that such a restriction "would allow the NAT to take a live eagle for religious purposes in a manner that would avoid . . . burdening the religious and cultural beliefs and practices of the EST." R. at 533. Ultimately, Defendants concluded

> that approving a permit for the NAT to take up to two bald eagles outside the boundaries of the Wind River Reservation is the least restrictive means of achieving its compelling governmental interests in protecting eagle populations and in protecting the religions and cultures of both the NAT and the EST.

*Id.* at 533.

On March 13, 2012, Defendants filed the administrative record with this Court. Doc. No. 16. On March 30, 2012, Plaintiffs filed an *Amended Complaint*. Doc. No. 18. In the *Amended Complaint*, Plaintiffs alleged that Defendants denied their permit application by excluding the Wind River Reservation from the area where the take could occur. Plaintiffs claimed that Defendants' refusal to allow eagle take within the Wind River Reservation violated the Religious Freedom Restoration Act ("RFRA"), the Free Exercise Clause of the First Amendment, and the Administrative Procedure Act ("APA"). *Id.* On April 13, 2013, Defendants filed a second notice of filing the administrative record. Doc. No. 19. On April 27, 2012, Defendants filed an *Answer* to Plaintiffs' *Amended Complaint*. Doc. No. 22.

On May 2, 2012, the Eastern Shoshone Tribe moved the Court to file an *amicus curiae* brief. Doc. No. 23. The Court granted the Eastern Shoshone Tribe's motion. Doc. No. 26.

On May 31, 2013, Plaintiffs filed a motion on their RFRA claim alone. Doc. No. 29. Defendants filed a response. Doc. No. 34. The Eastern Shoshone Tribe filed an *amicus curiae* brief. Doc. No. 36. Ultimately, the Court denied Plaintiffs' motion and found in favor of Defendants. Doc. No. 45. This Court concluded that Defendants "did not violate RFRA because it advanced and balanced its compelling interests via the least restrictive means." *Id.*

Plaintiffs filed a motion for reconsideration. Doc. No. 46. Both Defendants and the Eastern Shoshone Tribe opposed the motion. Docs. No. 47, 48. The Court denied Plaintiffs' motion for reconsideration. Doc. No. 49.

On February 11, 2013, Plaintiffs filed a motion seeking to amend their *Amended Complaint* by adding an Establishment Clause claim. Doc. No. 59. Defendants opposed the motion. Doc. No. 60. The Court found Plaintiffs' motion untimely and denied the motion. Doc. No. 62.

On March 22, 2013, the parties filed a *Joint Stipulation for Stay of Proceedings*. Doc. No. 65. When the first permit was issued, if Plaintiffs were to take an eagle pursuant to the permit within Wyoming but outside of the Wind River Reservation, then Plaintiffs would have violated state law absent a separate exemption from the State of Wyoming. *See* Wyo. Stat. Ann. § 23-3-101 (2007) (amended 2013). In February 2013, the Wyoming State Legislature amended Wyo. Stat. Ann. § 23-3-101 (2013) to provide a new exception to the prohibition on taking eagles within Wyoming: "Any person who takes an eagle is guilty of a high misdemeanor . . . unless the taking is authorized by federal law or commission rules adopted in compliance with federal law." That same month, Defendants also issued a new permit for the Northern Arapaho

Tribe to take up to two eagles during the period from March 1, 2013 to February 28, 2014. The second permit contained the same location restriction as the first. As a result, the parties requested a sixty day stay "to allow the parties to consider the possible effects of the recently enacted amendment to W.S. § 23-3-101 on the current permit and on Plaintiffs' remaining claims." Doc. No. 65.

The Court granted the stipulated motion to stay the proceedings. Doc. No. 66. On May 24, 2013, the parties filed a *Joint Stipulation and Motion to Extend Stay of Proceedings* for essentially the same reasons they filed the first request but stated that more time was required. Doc. No. 67. The Court granted the second stipulated motion to stay the proceedings. Doc. No. 68. On June 26, 2013, Plaintiffs filed an *Unopposed Motion to Extend Stay of Proceedings* requesting an additional thirty days. Doc. No. 69. The Court granted the third unopposed motion. Doc. No. 70.

On August 1, 2013, the parties filed a *Joint Status Report* to notify the Court "that they have been communicating with each other regarding anticipated further proceedings and intend to submit either a joint proposal, or separate proposals." Doc. No. 71. On August 16, 2013, the parties filed a *Joint Proposed Briefing Schedule for Plaintiffs' Remaining Claims* notifying the Court that further action of the Court was required to resolve the dispute. Doc. No. 72. The Court entered an order adopting the proposed briefing schedule. Doc. No. 73.

On August 28, 2013, Defendants filed a supplement to the administrative record. Docs. No. 74, 75. The supplemental administrative record concerned the second permit issued by Defendants. On September 30, 2013, Defendants filed a supplement to the supplemented administrative record. Doc. No. 75. In that supplement, Defendants included, among other documents, the *Findings for Northern Arapaho Tribe's Renewal Permit to Take Two Bald*

*Eagles for Religious Purposes* ("*Renewal Permit Findings*") regarding Plaintiffs' second application for a permit. R. at 2278–94. In the *Renewal Permit Findings*, Defendants stated the following with respect to Plaintiffs' first permit application: "Based on discussions during consultation with the EST, and as confirmed by the EST Attorney General in court proceedings, USFWS finds that the EST has a sincere religious and cultural belief in protecting eagles. Allowing take on the Wind River Reservation would burden the EST's religious and cultural beliefs." R. at 2280.

On October 14, 2014, Plaintiffs filed a *Motion for Summary Judgment on Remaining Claims* and an accompanying memorandum of law. Docs. No. 78, 79. On November 15, 2013, Defendants filed their *Cross-Motion for Summary Judgment on Plaintiffs' Remaining Claims* and accompanying memorandum. Docs. No. 86, 87. On December 6, 2013, Plaintiffs filed an *Opposition to Motion to Strike* and a *Reply Brief.* Doc. No. 89, 90.

## STANDARD OF REVIEW

In the present motion, Plaintiffs raised two distinct issues with two separate standards of review. The Court is not unaware of the fact that the procedural posture of this case creates some difficulty. However, that difficulty can be overcome by considering the two distinct issues in the proper context and under the appropriate standards of review. *See Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 823 n.4 (10th Cir. 2000) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994) ("Here, the parties' use of, and the district court's acceptance of, the summary judgment procedures resulted in no harm to either party. The district court's review of the [agency's] decision was fundamentally consistent with the review procedures established by the Tenth Circuit.").

When reviewing Defendants' final agency action, this Court must act as a court of appeal.[4] *See Id.* at 1579 ("Reviews of agency action in the district courts must be processed *as appeals*."). The APA authorizes judicial review only of final agency action. *Kobach v. U.S. Election Assistance Com'n*, 772 F.3d 1183, 1190 (2014) (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)). "To be final, agency action must mark the consummation of the agency's decisionmaking process, and must either determine rights or obligations or occasion legal consequences." *Id.* (quoting *Alaska Dept. of Envtl. Conservation v. EPA*, 540 U.S. 461 (2004)) (internal quotation marks omitted).

A reviewing court must first determine whether the administrative process was adjudication or rulemaking. "Adjudication is a determination of individual rights or duties" and "[r]ulemaking is a determination of general applicability and predominantly prospective effect." 32 *Fed. Prac. & Proc. Judicial Review* § 8122 (1st ed. 2014). A reviewing court must also determine whether the administrative process was formal or informal. The basic distinction between formal and informal adjudications lies in the use of "formal, trial-like procedures [or] procedures which deviate significantly from the methods of trial." *Id.* § 8136.

## I.     Arbitrary-and-Capricious Standard of Review

When reviewing an informal adjudication under the APA, a court must determine "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse

---

[4] Referring to the parties as Plaintiffs and Defendants in this context is a misnomer. Petitioners and Respondents would be more appropriate terms. *See* U.D.C.L.R. 83.6 (March 4, 2014). However, the case caption employs the terms Plaintiffs and Defendants; and therefore, the Court will use those terms in this Order.

of discretion." *Olenhouse*, 42 F.3d at 1574. "This standard of review is 'very deferential' to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it." *Kobach v. U.S. Election Assistance Com'n*, 772 F.3d 1183, 1197 (10th Cir. 2014) (citing *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013); *Aviva Life & Annuity Co. v. FDIC*, 654 F.3d 1129, 1131 (10th Cir. 2011); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1188 (10th Cir. 2006)).

When an administrative agency interprets the statutes Congress tasked the agency with enforcing, a reviewing court must afford the agency considerable deference, known as *Chevron* deference. *United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug*, 22 F.3d 235, 238 (10th Cir. 1994). *Chevron* deference is a two-step process. The reviewing court must first ask whether Congress's intent is clear from the statute. *Id.* If the intent is unclear, then the reviewing court must determine whether the agency's interpretation of the statute is based on a permissible construction of the statute. *Id.* When an administrative agency interprets its own regulations, courts must also afford the agency considerable deference, known as either *Auer* or *Seminole Rock* deference. As the Supreme Court recently explained, "When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent with the regulation." *Decker v. Northwest Environmental Defense Center*, 133 S.Ct. 1326, 1337 (2013) (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011); *Auer v. Robbins*, 519 U.S. 452 (1997)) (internal quotation marks omitted).

A court reviewing an informal adjudication must accept the administrative agency's factual determinations unless they are "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). A court must determine "whether the agency examined the relevant data and articulated a rational

connection between the facts found and the decision made." *Kobach*, 772 F.3d at 1197 (quoting *Aviva Life*, 654 F.3d at 1131) (internal quotation marks omitted). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *City of Colorado Springs v. Solis*, 589 F.3d 1121, 1131 (10th Cir. 2009) (quoting *McAlpine v. United States*, 112 F.3d 1429, 1436 (10th Cir. 1997)).

Under the APA, judicial review is generally limited to the administrative record. 5 U.S.C. § 706(2)(F) ("the court shall review the whole record or those parts of it cited by a party"); *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1141 n.7 (10th Cir. 1991). A court may consider extra-record evidence in two limited circumstances: "(1) when the action is adjudicatory in nature and the agency's fact-finding procedures [are] inadequate; and (2) when issues not previously before the agency are raised in a proceeding to enforce a nonadjudicatory action." *Franklin*, 934 F.2d at 1141 n.7. In the Tenth Circuit, "the district court *itself* must examine the administrative record." *Olenhouse*, 42 F.3d at 1576.

## II. Free Exercise Clause Standard of Review

When reviewing a constitutional challenge to agency action, the district court must treat the constitutional challenge under the APA separately from an arbitrary and capricious challenge. *F.C.C. v. Fox*, 556 U.S. 502, 516 (2009) ("If the [agency's action] was not arbitrary and capricious in the ordinary sense, it satisfies the Administrative Procedure Act's 'arbitrary [or] capricious' standard; its lawfulness under the Constitution is a separate question to be addressed in a constitutional challenge."). No deference is given to an administrative agency's interpretation of the Constitution. *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1231 (10th Cir. 1999) ("[A]n unconstitutional interpretation is not entitled to *Chevron* deference . . . . [D]eference to an

agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions."). Accordingly, when a constitutional challenge is made to agency action, a court must conduct de novo review. 33 *Fed. Prac. & Proc. Judicial Review* § 8363 ("Courts are free to conduct de novo review of an administrative resolution of a constitutional issue.").

The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* . . . ." U.S. Const. amend I (emphasis added). "[N]eutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt*, 135 S.Ct. at 859 ((quoting *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878–82 (1990)). On the other hand, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *accord e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) ("if a law that burdens a religious practice or belief is not neutral or generally applicable, it is subject to strict scrutiny"); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (10th Cir. 2002).

Whether a district court must limit its constitutional review of agency action to the administrative record is question that has not been definitively answered by the Tenth Circuit or the Supreme Court. However, in pertinent part, § 706 provides the following: "The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law. . . . In making the foregoing determinations, the court shall review

15

the whole record or those parts of it cited by a party . . . ." 5 U.S.C. § 706. Accordingly, this Court finds that when conducting constitutional review of agency action, a court must limit its review to the administrative record unless an exception applies. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service*, 2014 WL 5859067 at \*38 (D. N.M. Oct. 22, 2014) ("Although the substantive nature of the claim does change the substantive standard of review— e.g, arbitrary-and-capricious review, *Chevron* deference, de novo review, etc.—it does not change the procedural framework under which the case must progress: the APA.").

## DISCUSSION

Before the Court can review Defendants' agency action, it must first determine whether the action is final, whether it was rulemaking or adjudication, and whether it was formal or informal. Plaintiffs applied for a permit to take up to two bald eagles and Defendants ultimately issued a permit. The parties agree, and the Court finds, that Defendants' agency action was final. Defendants' action determined the individual rights of Plaintiffs and was not generally applicable or predominately prospective. Thus, Defendants' final agency action is best characterized as adjudication. A review of the record reveals that Defendants did not conduct formal, trial-like procedures. Instead, Defendants' procedures deviated significantly from those used in trial. Therefore, Defendants' final agency action is best characterized as an informal adjudication.

In the present motion, Plaintiffs raised two distinct issues: (1) Defendants' informal adjudication of the permit application was arbitrary or capricious; and (2) Defendants' informal adjudication of the permit application violated Plaintiffs' right to free exercise of religion under the First Amendment. In substance, Plaintiffs appealed Defendants' informal adjudication of the permit application pursuant to § 706 of the APA. Although entitled a *Motion for Summary Judgment on Remaining Claims*, Plaintiffs' motion is more appropriately considered a brief on

16

appeal. *See Olenhouse*, 42 F.3d 1560, 1579 ("[Respondents] filed what they denominated a 'Motion for Summary Judgment,' but which was, in effect, their brief on appeal."). The Court will address each issue raised by Plaintiffs in turn below. However, before the Court can address the substance of the issues raised, it must first determine whether Plaintiffs' motion is moot.

## I. Mootness

As an initial matter, this Court must address the issue of mootness. Plaintiffs last applied for a permit to take bald eagles on the Wind River Reservation in September of 2012. R. at 2170–76. The second permit issued by Defendants was effective from March 1, 2013 to February 28, 2014. R. at 2256. As far as the Court is aware, Plaintiffs have not filed any further permit applications.

Judicial review of administrative action is limited by the requirement that there is an actual case or controversy. *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 72–73 (1983); *see also Citizen Center v. Gessler*, 770 F.3d 900, 906 (10th Cir. 2014) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996)). As the Ninth Circuit Court of Appeals recognized, "It is true that the concept of mootness is placed under some strain in the context of administrative orders whose formal legal effect is typically shortlived." *Campesinos Unidos, Inc. v. U.S. Dept. of Labor*, 803 F.2d 1063 (9th Cir. 1986) (citation omitted) (internal quotation marks omitted). To address that problem, courts recognize an exception to mootness for controversies that are "capable of repetition, yet evade review." *Id.* (quoting *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498 (1911)) (internal quotation marks omitted). "If the improper conduct is likely to be repeated, the harm is capable of repetition, and presents a proper controversy for adjudication." *Id.* (citing *Securities Exchange Commission v. Medical Committee for Human Rights*, 404 U.S. 403 (1972)). The exception for controversies capable of

repetition, yet evading review is narrow and applies only in exceptional circumstances. *Jordan v. Sosa*, 654 F.3d 1012, 1034–35 (10th Cir. 2011).

As this Court noted in its Order of November 5, 2012, the first permit issued by Defendants was renewable. When Plaintiffs sought renewal of the first permit, Defendants determined that "there have been no changes to the religious and cultural beliefs of either the NAT or the EST since the Permit was issued and that the conditions placed on the Permit remain the same." R. at 2280. Although the second permit has expired, the Court finds that if Plaintiffs were to submit a third permit application, the same issues regarding the cultural or religious objection on the part of the Eastern Shoshone Tribe would arise and Defendants would likely abide by their original decision. If the Court were to dismiss this case on mootness grounds, Defendants' decision would evade review. Accordingly, the Court finds the exception for controversies capable of repetition, yet evading review applies in this case.

## II.    Defendants' Motion to Strike

The second issue the Court must address is whether the Court may consider the extra-record evidence submitted by Plaintiffs. In a footnote, Defendants moved to strike the extra-record evidence submitted by Plaintiffs. Defendants assert that the extra-record evidence referred to as the "NAT administrative record" consists largely of documents created during the period of time when this case was stayed and after Defendants made their decision. Defendants also point out that this information was not before the agency at the time it made its decision. Therefore, Defendants argue that Plaintiff may not challenge the final agency action based on extra-record, post-decisional documentation.

In response, Plaintiffs rely on Rule 12(f) of the Federal Rules of Civil Procedure and assert that the NAT administrative record is not redundant, impertinent or scandalous. With

respect to their First Amendment claim, Plaintiffs assert that the summary judgment standard permits them to rely on extra-record evidence. With respect to their APA claim, Plaintiffs argue that reliance on extra-record evidence is appropriate because Plaintiffs had no previous chance to refute the evidence in the administrative record.

As explained above, arbitrary-and-capricious review of administrative action under § 706 of the APA is limited to the administrative record. A court may supplement the administrative record in two limited circumstances. *See Franklin*, 934 F.2d at 1141 n.7. Of importance to this case is the second exception, "when the action is adjudicatory in nature and the agency's fact-finding procedures [are] inadequate." *Id.* Plaintiffs assert they had no opportunity to challenge the facts contained in the administrative record. However, the administrative record reflects extensive fact-finding efforts by Defendants. Defendants communicated both with Plaintiffs and the Eastern Shoshone Tribe on several occasions. Thus, the Court finds that Defendants' fact-finding procedures were not so inadequate as to require supplementation of the administrative record. Accordingly, for the purposes of arbitrary-and-capricious review of Defendants' action, this Court will limit its review to the administrative record and Defendants' motion to strike in this regard should be granted.

Although arbitrary-and-capricious review is limited to the administrative record, it is unclear whether constitutional review is so limited. Plaintiffs relied on Rule 56 of the Federal Rules of Civil Procedure when they filed their motion, but motions for summary judgment pursuant to Rule 56 are inappropriate in the context of review of administrative action. *See Olenhouse*, 42 F.3d at 1580 ("motions for summary judgment are conceptually incompatible with the very nature and purpose of [review of administrative action]."). One district court in the Tenth Circuit recently determined that constitutional review of administrative action is limited to

the administrative record. *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service*, 2014 WL 5859067 (D. N.M. Oct. 22, 2014) ("[The First Amendment claim] arises under the Constitution, but it is subject to the APA's procedural provisions, which generally limit the judicial review to the administrative record.").

As explained above, the Tenth Circuit and the Supreme Court have not definitively addressed the question of whether constitutional review of agency action is limited to the administrative record. When addressing a similar issue, this Court held in its Order of November 5, 2012 that "RFRA and the APA provide two distinct causes of action with different standards of review, and therefore this Court rejects the argument that the record rule applies to Plaintiffs' RFRA claims." Doc. No. 45. Although the Court so concluded, the Court did not consider any evidence outside of the administrative record in its Order. *See* Doc. No. 45.

In pertinent part, § 706 provides the following: "The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law. . . . In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . . ." 5 U.S.C. § 706. The Supreme Court has stated the following:

> The appropriate standard for review was, accordingly, whether the [informal] adjudication was 'arbitrary, capricious, an abuse of discretion, *or otherwise not in accordance with law*, as specified in 5 U.S.C. § 706(2)(A). In applying that standard, the focal point for judicial review should be *the administrative record already in existence*, not some new record made initially in the reviewing court.

*Camp v. Pitts*, 411 U.S. 138, 142 (1973). As the Supreme Court has explained, "otherwise not in accordance with law" encompasses constitutional challenges. *Fox*, 556 U.S. at 516. Thus, this Court finds that it must limit its constitutional review of Defendants' informal adjudication to the administrative record. Accordingly, the Court finds that Defendants' motion to strike should be granted.

### III. Plaintiffs' Arbitrary or Capricious Claim

The third issue the Court must address is whether Defendants' informal adjudication of Plaintiffs' permit application was arbitrary or capricious in violation of § 706(2)(A) of the APA. Within the context of arbitrary-and-capricious review, Plaintiffs raised several arguments. First, Plaintiffs argue that Defendants incorrectly interpreted 50 C.F.R. § 22.22 as allowing them to consider the culture and religion of the Eastern Shoshone Tribe. Second, Plaintiffs argue Defendants' conclusion that eagle take by the Northern Arapaho Tribe offends the culture and religion of the Eastern Shoshone Tribe is not supported by substantial evidence.

#### A. Defendants' interpretation of 50 C.F.R. § 22.22 was not plainly erroneous or inconsistent with the regulation.

The Court must determine whether Defendants' interpretation of 50 C.F.R. § 22.22 was plainly erroneous or inconsistent with the regulation. In pertinent part, that regulation provides the following:

> How do we evaluate your application for a permit? We will conduct an investigation and will only issue a permit to take, possess, transport within the United States, or transport into or out of the United States bald or golden eagles, or their parts, nests or eggs, for Indian religious use when we determine that the taking, possession, or transportation is compatible with the preservation of the bald and golden eagle. In making a determination, we will consider, *among other criteria*, the following:
>
> (1) The direct or indirect effect which issuing such permit would be likely to have upon the wild populations of bald or golden eagles; and
>
> (2) Whether the applicant is an Indian who is authorized to participate in bona fide tribal religious ceremonies.

50 C.F.R. § 22.22(a) (emphasis added). Plaintiffs argue that under § 22.22, Defendants should have only considered the effect of the proposed take on the existing eagle population and the sincerity of the Northern Arapaho Tribe's religious belief. Defendants argue that the phrase "among other criteria" allows them to consider the implications on the Eastern Shoshone Tribe's

culture and religion if it were to issue the Northern Arapaho Tribe the requested permit. In particular, Defendants assert that the phrase "among other criteria" includes the federal government's compelling interests under RFRA.

When an administrative agency is interpreting its own regulations, a reviewing court must give considerable deference to that interpretation. *Decker*, 133 S.Ct. at 1337. Here, Defendants interpreted their own regulation and in particular the phrase "among other criteria." Interpreting "among other criteria" to include considerations such as the federal governments' compelling interests is not plainly erroneous or inconsistent with the regulation. Accordingly, the Court will defer to Defendants' interpretation of § 22.22.

### B. Defendants' factual conclusion that eagle take by the Northern Arapaho Tribe offends the culture and religion of the Eastern Shoshone Tribe was not arbitrary or capricious.

The Court must next determine whether Defendants' factual conclusion that eagle take by the Northern Arapaho Tribe offends the culture and religion of the Eastern Shoshone Tribe was arbitrary or capricious. Plaintiffs argue there is no substantial evidence to support Defendants' conclusion about the Eastern Shoshone Tribe's cultural or religious objection. As an initial point, the Court notes that the APA does not directly address whether an agency's factual conclusions in an informal adjudication should be reviewed under the arbitrary-and-capricious standard of review or under the higher substantial evidence standard of review. *See* 33 *Fed. Prac. & Proc. Judicial Review* § 8342 ("The general rule is that informal adjudications should be reviewed under the arbitrariness standard. . . . This principle has developed by default in the federal system since the APA does not prescribe review of such decisions.").

In *Kobach*, the Tenth Circuit was considering whether an informal adjudication violated the APA. 772 F.3d 1183. The Tenth Circuit applied the arbitrary-and-capricious standard of

review—"An informal adjudication must be reversed if it is 'arbitrary, capricious, an abuse of discretion, or otherwise in not in accordance with law.' *Id.* at 1197 (quoting 5 U.S.C. §706(2)(A)) (citing *City of Colo. Springs v. Solis*, 589 F.3d 1121, 1131, 1134 (10th Cir. 2009)). Plaintiffs seem to assert that the Court should apply the substantial evidence test. *See* § 706(2)(E) ("The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be unsupported by substantial evidence in a case subject to sections 556 and 557 of this tittle . . . ."). Admittedly, the line between the substantial evidence review and arbitrary-and-capricious review is less than clear. *See Olenhouse*, 42 F.3d at 1575 ("In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record. In reviewing the administrative record for factual support, we adopt the analysis articulated by then-Judge Scalia in *Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677, 683 (D.C.Cir. 1984), and rule informal agency action will be set aside as arbitrary if it is unsupported by 'substantial evidence.' This is not to substitute the 'arbitrary or capricious' standard applicable to informal agency action under § 706(2)(A) with the arguably more stringent standard of review applicable to formal agency action under § 706(2)(E)."). Nevertheless, this Court will apply the arbitrary-and-capricious standard of review in § 706(2)(A) to Defendants' factual conclusions and not the substantial evidence standard of review in § 706(2)(E).

The administrative record in this case spans three and a half years and more than two-thousand pages but contains only a few documents with limited references to the Eastern Shoshone Tribe's cultural or religious objection to eagle take by the Northern Arapaho Tribe on the Wind River Reservation. Several of these references, including the *Renewal Permit Findings*, occurred after Defendants made their decision regarding Plaintiffs' first permit

application. As such, the Court cannot consider those references. *See Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004) ("[a] reviewing court must review the administrative record before the agency at the time the agency made its decision."). The pre-decisional record and the *Permit Findings* contain the following references to a cultural or religious objection on the part of the Eastern Shoshone Tribe: (1) two references in the December 6, 2011 letter from A.G. Varilek; (2) two references in the December 16, 2011 letter from Mr. LeBeau; and (3) two references in Defendants' *Permit Findings*. R. at 381–95, 528–33, 1042–48.

From the Court's review of the administrative record, it appears that Defendants examined the data they had before them concerning the Eastern Shoshone Tribe's cultural or religious objection to the Northern Arapaho Tribe taking eagles on the Wind River Reservation. Although the administrative record is admittedly sparse, there is evidence in the record of a cultural or religious objection on the part of the Eastern Shoshone Tribe. The Court cannot substitute its own judgment for that of Defendants; and thus, the Court finds that Defendants' factual conclusion regarding the Eastern Shoshone Tribe's cultural or religious objection was not arbitrary or capricious.

### C. Plaintiffs' Constitutional Claims

Plaintiffs made several constitutional claims under the arbitrary-and-capricious review standard. In particular, Plaintiffs claim that Defendants' final agency action was arbitrary-and-capricious under the Free Exercise Clause, the Establishment Clause, and the Due Process Clause. The Court will not address the Establishment Clause and Due Process Clause claims as those claims were not raised in the *Amended Complaint*; and, as a result, are not properly before the Court. *See* Doc. No. 18.

Plaintiffs also argue that "the agency failed to consider the powerful effect of a criminal ban on eagle take by practitioners of NAT traditional religion on the [Wind River Reservation] and failed to properly weigh its obligation under BGEPA to ensure access to 'clean' eagles as a means of fostering Northern Arapahoe culture and religion." Doc. No. 79. Although Plaintiffs raise this issue under the guise of arbitrary-and-capricious review, Plaintiffs' argument is better characterized as a constitutional challenge. *See Fox*, 556 U.S. at 516 ("If the [agency's action] was not arbitrary and capricious in the ordinary sense, it satisfies the Administrative Procedure Act's 'arbitrary [or] capricious' standard; its lawfulness under the Constitution is a separate question to be addressed in a constitutional challenge."). Accordingly, this Court will address Plaintiffs' Free Exercise claim as a separate constitutional challenge.

## IV.    Plaintiffs' Free Exercise Claim

The final issue the Court must address is whether Defendants' informal adjudication of the permit application violated Plaintiffs' right to free exercise of religion under the First Amendment. When possible, courts should avoid addressing constitutional questions. *E.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). However, "avoidance of a difficulty will not be pressed to the point of disingenuous evasion." *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933) (Cardozo, J.). As explained above, arbitrary-and-capricious review of Defendants' informal adjudication of Plaintiffs' permit application does not resolve this case. Accordingly, the Court must consider the separate and distinct challenge that Defendants' informal adjudication was "not . . . in accordance with the law" because it violated the Free Exercise Clause of the First Amendment.

**A. Plaintiffs' challenge is to Defendants' constitutional decision in the informal adjudication of the permit application and is not a challenge to the Bald and Golden Eagle Protection Act itself.**

In order to apply the appropriate constitutional standard of review, the Court must first characterize Plaintiffs' constitutional challenge. A court determining the appropriate "level of constitutional review . . . must recognize a fundamental distinction between a challenge to the constitutionality of the relevant statute and the constitutionality of agency action." 33 *Fed. Prac. & Proc. Judicial Review* § 8363. In a footnote, Defendants argue the Court should only apply rational basis review because the BGEPA "is neutral and generally applicable, and any challenge is not subject to strict scrutiny." Doc. No. 87, p. 9 n.6. Defendants' argument misses the mark. Plaintiffs are not challenging the constitutionality of the BGEPA. Rather, Plaintiffs challenge the constitutional decision Defendants made during the informal adjudication of the permit application.

When faced with two opposing cultural and religious views about the take of eagles on the Wind River Reservation, Defendants had to decide what amounts to a constitutional question. [5] Defendants first determined they were required to consider both the Northern Arapaho Tribe's

---

[5] In this context, the Court uses the terms "culture" and "religion" interchangeably. As was recognized in *Cohen's Handbook of Federal Indian Law*: "Indians still have a hard time fitting their religious claims into free exercise terms. One reason for these difficulties is that it is at times impossible to distinguish between Indian religious activities and Indian cultural activities." § 14.03. When the Tenth Circuit addressed the BGEPA in other contexts, the court did not limit the analysis to only religious beliefs but instead considered culture and religion together. *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002); *United States v. Wilgus*, 538 F.3d 1127 (10th Cir. 2011). This Court will do the same here.

culture and religion, and the Eastern Shoshone Tribe's culture and religion. R. at 532. While Defendants were contemplating the compelling interests at issue in the context of RFRA, the same interests apply in the context of the Free Exercise Clause. *E.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) ("RFRA expressly adopted the compelling interest test 'as set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).'"). Ultimately, Defendants concluded "that approving a permit for the NAT to take up to two bald eagle outside the boundaries of the Wind River Reservation is the least restrictive means of achieving its compelling governmental interests in protecting eagle populations and in protecting the religions and cultures of both the NAT and the EST." R. at 533. Thus, Defendants made a constitutional decision and this action calls upon the Court to review that decision.

### B. Defendants' informal adjudication of Plaintiffs' permit application is facially discriminatory; and thus, is subject to strict scrutiny.

The Free Exercise Clause of the First Amendment states that "*Congress* shall make no *law* respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend I (emphasis added). Of course, Defendants' informal adjudication of Plaintiffs' permit application is not a "law" in the ordinary sense and the U.S. Fish and Wildlife Service is not Congress. The question then becomes whether Defendants' informal adjudication of Plaintiffs' permit application is subject to the protections of the First Amendment.

In the Fish and Wildlife Act, Congress delegated some of its powers to the U.S. Fish and Wildlife Service. *See* 16 U.S.C. § 742b (2012). In particular, Congress stated the following:

> There is established within the Department of the Interior the United States Fish and Wildlife Service.

\* \* \*

> All functions and responsibilities placed in the Department of the Interior or any official thereof by this Act shall be included among the functions and responsibilities of the Secretary of the Interior, as the head of the Department, and shall be carried out under his direction pursuant to such procedures or delegations of authority as he may deem advisable and in the public interest.

*Id.* at § 742b(b).

The BGEPA provides that "[w]henever, after investigation, the Secretary of the Interior shall determine that it is compatible with the preservation of the bald eagle or the golden eagle to permit the taking . . . of specimens thereof . . . for the religious purposes of Indian tribes, . . . he may authorize the taking of such eagles . . . ." 16 U.S.C. § 668a. The Secretary of the Interior delegated his authority to issue permits for taking bald and golden eagles for the religious purposes of Indian tribes to the U.S. Fish and Wildlife Service. *See* 50 C.F.R. § 10.1 (2015) ("The regulations of this Subchapter B are promulgated to implement the following statutes enforced by the U.S. Fish and Wildlife Service . . . Bald and Golden Eagle Protection Act, 16 U.S.C. § 668a–668d . . . ."). Accordingly, the U.S. Fish and Wildlife Service is an administrative agency with congressionally delegated authority to enforce the BGEPA.

Whether Defendants' informal adjudication of Plaintiffs' permit application is a "law" is a somewhat amorphous question. Administrative "adjudications, regardless of formality, end in some sort of order." 33 *Fed. Prac. & Proc. Judicial Review* § 8345. Furthermore, an agency must provide the reasons for its decision. *Id.* at § 8243. The reasons for Defendants' decision, and in effect its order, are contained within the *Permit Findings. See* R. at 528–33; *see also* R. at 2278–94. Plainly, Defendants' *Permit Findings* are not a legislative enactment of the type one typically thinks of as a law made by Congress. Nevertheless, for purposes of judicial review,

this Court must treat Defendants' *Permit Findings* as a law made by Congress; and therefore, Defendants' *Permit Findings* are subject to the Free Exercise Clause of the First Amendment.

Next, the Court must determine whether Defendants' informal adjudication was neutral and generally applicable or whether it was facially discriminatory. Unsurprisingly, the case law is not well developed regarding whether an informal adjudication can be facially discriminatory. Perhaps this is because "[t]he principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions." *Church of the Lukumi Babalu Aye*, 508 U.S. at 523.

In *Church of the Lukumi Babalu Aye*, the Supreme Court explained how to determine if a law is neutral and of general applicability or if it is facially discriminatory. "[W]e must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." 508 U.S. at 534. On its face, Defendants' *Permit Findings* refer to the cultures and religions of both the Northern Arapaho Tribe and the Eastern Shoshone Tribe. Defendants specifically considered the cultural or religious objection of the Eastern Shoshone Tribe. *See* R. at 530, 533; *see also* R. at 2279. In particular, Defendants explained that the Eastern Shoshone Tribe "opposed the take of eagles on the Wind River Reservation because bald eagles are sacred to the [Eastern Shoshone Tribe]." R. at 530.

Ultimately, Defendants concluded that issuing the Northern Arapaho Tribe a permit to take up to two bald eagles within Wyoming but outside of the Wind River Reservation "would avoid . . . burdening the religious and cultural beliefs and practices of the [Eastern Shoshone Tribe]." R. at 533. Therefore, Defendants' *Permit Findings* are facially discriminatory because Defendants' decision burdened the Northern Arapaho Tribe's culture and religion based on the

cultural or religious objection of the Eastern Shoshone Tribe. *See* R. at 528–33. In *Church of the Lukumi Babalu Aye*, the Supreme Court explained the constitutional standard for evaluating facially discriminatory government action—"[I]t is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." 508 U.S. at 533 (citations omitted). Accordingly, Defendants' decision to limit the area where the Northern Arapaho Tribe could take bald eagles because of the cultural or religious objection of the Eastern Shoshone Tribe must be justified by a compelling interest and must be narrowly tailored to advance that interest.

**C. Due to the Supreme Court's recent decisions in *Hobby Lobby v. Burwell* and *Holt v. Hobbs*, this Court must reconsider its holding in the Order of November 5, 2012.**

Defendants argue this Court should not decide the Plaintiffs' free exercise claim under the First Amendment because that claim is foreclosed by this Court's Order of November 5, 2012. In the Order of November 5, 2012, this Court held "that the current permit reflects the least restrictive means of furthering the [Defendants'] compelling interests." Doc. No. 45, p. 16. In making that decision, this Court relied upon the Tenth Circuit's determination in *Hardman* and *Wilgus* that the federal government has a compelling interest in fostering and protecting the culture and religion of federally-recognized Indian tribes. *Id.* When the Tenth Circuit first considered whether the federal government has a compelling interest in fostering and protecting the culture and religion of federally-recognized Indian tribes, the court noted "[t]here is . . . little guidance from the Supreme Court in determining what qualifies as a compelling interest." *Id.*

Following *Hardman*, the Supreme Court decided three cases that dealt with determining what constitutes a compelling interest in the context of the exercise of religion. *Holt v. Hobbs*, 135 S.Ct. 853 (2015); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 546 U.S. 418 (2006). All three cases

addressed compelling interests in the context of RFRA. Two of those cases, *Holt v. Hobbs* and

*Burwell v. Hobby Lobby*, were decided after this Court entered its Order of November 5, 2012.

In *Holt*, the Supreme Court explained the cumulative effect of *O Centro* and *Hobby Lobby*:

> The Department argues that its grooming policy represents the least restrictive means of furthering a "'broadly formulated interes[t],'" *see Hobby Lobby, supra,* at ——, 134 S.Ct., at 2779 (quoting *O Centro,* 546 U.S., at 431, 126 S.Ct. 1211), namely, the Department's compelling interest in prison safety and security. But RLUIPA, like RFRA, contemplates a "'more focused'" inquiry and "'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Hobby Lobby,* 573 U.S., at ——, 134 S.Ct., at 2779 (quoting *O Centro, supra,* at 430–431, 126 S.Ct. 1211 (quoting § 2000bb–1(b))). RLUIPA requires us to "'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'" and "to look to the marginal interest in enforcing" the challenged government action in that particular context. *Hobby Lobby, supra,* at ——, 134 S.Ct. at 2779 (quoting *O Centro, supra,* at 431, 126 S.Ct. 1211; alteration in original).

*Holt v. Hobbs,* 135 S. Ct. 853, 863 (2015).

Whether this Court should consider the subsequent development of the law following its

Order of November 5, 2012 is governed by the law of the case doctrine. *See Arizona v.

California,* 460 U.S. 605, 618 (1983). Under the law of the case doctrine, "when a court decides

upon a rule of law, that decision should continue to govern the same issues in subsequent stages

in the same case." *Id.* However, the "[l]aw of the case directs a court's discretion, it does not

limit the tribunal's power." *Id.* Pursuant to the "law of the case doctrine . . . it is not improper

for a court to depart from a prior holding if convinced that it is clearly erroneous and would work

a manifest injustice." *Id.* at 618, 618 n.8; *Major v. Benton,* 647 F.2d 110, 112 (10th Cir. 1981)

("When a court enunciates a rule of law in the course of a given case, the law of the case doctrine

generally requires the court to adhere to the rule throughout the proceedings. The rule is one of

expedition, designed to bring about a quick resolution of disputes by preventing continued

reargument of issues already decided. Unlike res judicata, the rule is not an 'inexorable

command,' but is to be applied with good sense. When a lower court is convinced that an interlocutory ruling it has made is substantially erroneous, the only sensible thing to do is to set itself right to avoid subsequent reversal." (citations omitted); *see also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)) ("The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.").

Here, it would be clearly erroneous and result in manifest injustice if this Court ignored the Supreme Court's holdings in *Hobby Lobby* and *Holt*. As explained below, this Court believes that in light of *Hobby Lobby* and *Holt*, the decision to limit Plaintiffs' permit to areas outside of the Wind River Reservation is not justified by a compelling interest. Accordingly, under the law of the case doctrine, this Court must depart from its holding in the Order of November 5, 2012.

### D. Two different standards apply under the Religious Freedom Restoration Act and the Free Exercise Clause when a challenged government action is facially discriminatory.

While this Court's holding today departs from its Order of November 5, 2012, to a certain extent, the holding today and the Order of November 5, 2012 address different standards. In the case of a neutral and generally applicable law, RFRA requires that the federal government may "not *substantially burden* a person's exercise of religion" unless the substantial burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1 (2012) (emphasis added). On the other hand, the First Amendment only requires that the government satisfy something less than strict scrutiny. *See Smith*, 494 U.S. 872 (1990); *see also Holt*, 135 S.Ct. at 859 ("neutral, generally applicable laws that incidentally burden the exercise of religion usually

do not violate the Free Exercise Clause of the First Amendment") (quoting *Smith*, 494 U.S. at 878–82). Thus, when the challenge is to a neutral and generally applicable law, RFRA and the First Amendment have different standards. *See Hobby Lobby*, 134 S.Ct. at 2767 ("By enacting RFRA, Congress went far beyond what this Court has held is constitutionally required.").

In the case of a facially discriminatory law, under RFRA, the federal government may not substantially burden a person's exercise of religion unless the substantial burden is in furtherance of compelling interests and is the least restrictive means of furthering those interests. 42 U.S.C. § 2000bb-1. On the other hand, under the First Amendment, the government may not burden a person's exercise of religion unless the burden "is justified by a compelling interest" and the burden is "narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye*, 50 U.S. at 533, 546. While RFRA requires the challenger to establish that a facially discriminatory law places a "substantial burden" on his exercise of religion, the First Amendment only requires the challenger to establish that the law "burdens" his exercise of religion. *Id.*; *Axson-Flynn*, 356 F.3d at 1294 ("if a law that *burdens* a religious practice or belief is not neutral or generally applicable, it is subject to strict scrutiny" (emphasis added)); *Tenafly Eruv Ass'n*, 309 F.3d at 165 (10th Cir. 2002). *But see Church of the Lukumi Babalu Aye*, 50 U.S. at 565 (Scalia, J. concurring) ("[O]ur cases have established that the free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden. Thus we have applied the same rigorous scrutiny on religious exercise resulting from the enforcement of formally neutral, generally applicable laws as we have applied to burdens caused by laws that single out religious exercise . . . ." (internal quotation marks omitted) (citations omitted)). Moreover, while RFRA requires the federal government to prove that its law is the "least

restrictive means" of achieving its compelling interests, the First Amendment requires the government to prove that its law is "narrowly tailored" to achieve its compelling interests. Thus, by enacting RFRA, Congress created a different standard for evaluating facially discriminatory laws than exists under the First Amendment. *See* Pevar, Stephan L., *The Rights of Indians and Tribes* 227 (2012) ("As RFRA and RLUIPA illustrate, Congress is permitted to pass a law that creates a right that does not exist under the Constitution (and Congress has passed scores of civil rights laws that do precisely that).").

In their briefs, the parties argued at length about whether the substantial burden element was satisfied in this case. In its Order of November 5, 2012, this Court assumed, without deciding, that the refusal to allow Plaintiffs to take up two to bald eagles within the Wind River Reservation placed a substantial burden on Plaintiffs' religious exercise. Doc. No. 45. If the Court were considering the challenge to Defendants' informal adjudication under RFRA, it would have to consider the "substantial burden" requirement. *See* Doc. No. 45, 14–16. However, as the Court is considering the challenge to Defendants' facially discriminatory informal adjudication under the Free Exercise Clause, it need not consider whether Defendants' final agency action placed a substantial burden on Plaintiffs' free exercise of religion. Rather, the Court need only consider whether Defendants' informal adjudication of Plaintiffs' permit application burdened Plaintiffs' free exercise of religion.

### E. Defendants' decision to exclude the Wind River Reservation from the area where Plaintiffs could take up to two bald eagles per year violated the Free Exercise Clause of the First Amendment.

Having determined that Defendants' informal adjudication of Plaintiffs' permit application is subject to the First Amendment and was facially discriminatory, the Court must now consider whether the decision to exclude the Wind River Reservation from the area where

Plaintiffs could take up to two bald eagles per year violated the Free Exercise Clause of the First Amendment. In *Church of the Lukumi Babalu Aye*, the Supreme Court explained that government action "burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." 508 U.S. at 533 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)) (internal quotation marks omitted). Accordingly, challengers must first prove that the government action burdened their free exercise of religion. *Id.* Once the challengers have done so, the government must prove that its action is "justified by a compelling interest" and that the action is "narrowly tailored to advance that interest." *Id.* at 533.

1. **Defendants' decision to exclude the Wind River Reservation from the area where Plaintiffs could take up to two bald eagles per year burdened Plaintiffs' free exercise of religion.**

The question of whether Defendants' decision burdened Plaintiffs' free exercise of religion is easily answered. Defendants first determined that the take of up to two bald eagles within Wyoming was "compatible with the preservation of the bald eagle" and that the take was for a bona fide religious purpose of the Northern Arapaho Tribe. R. at 533. Defendants then determined that to "avoid . . . burdening the religious and cultural beliefs and practices of the [Eastern Shoshone Tribe]," Plaintiffs could not take the two bald eagles per year within the Wind River Reservation. R. at 533.

The Wind River Reservation is shared by the Northern Arapaho Tribe and the Eastern Shoshone Tribe, but it also contains lands owned solely by the Northern Arapaho Tribe. R. at 233. Significantly, the Northern Arapaho Tribe owns over 4,000 acres near the Arapaho Ranch within the Wind River Reservation. *Id.* Not allowing the Northern Arapaho Tribe to participate

in the sincere religious practice on their land constitutes a burden on their free exercise of religion.

Plaintiffs argue that Defendants' failure to issue a permit to take eagles on the Wind River Reservation is a criminalization of their religion. Defendants argue that they did not deny Plaintiffs' permit application; and therefore, could not have criminalized Plaintiffs' religion. The Court need not address this question. For purposes of First Amendment review, it is enough to determine that Defendants' informal adjudication placed a burden on Plaintiffs' free exercise of religion.

### 2. Defendants' decision to exclude the Wind River Reservation from the area where Plaintiffs could take up to two bald eagles per year is not justified by a compelling interest.

Next, the Court must consider whether Defendants' decision to restrict Plaintiffs from taking up to two bald eagles per year within the Wind River Reservation is justified by a compelling interest. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533. In the *Permit Findings*, Defendants claimed that two interests justified their decision: (1) an interest in protecting the bald eagle and; (2) an interest in fostering and protecting the culture and religion of the Eastern Shoshone Tribe. R. at 528–33. Both parties agree that the federal government has a compelling interest in protecting bald and golden eagles. Docs. No. 79, 87. Moreover, Defendants determined that the take of up to two bald eagles per year within Wyoming was compatible with that compelling interest. R. at 530–31.

The real dispute in this case is the question of whether Defendants' decision to restrict the Northern Arapaho Tribe from taking up to two bald eagles per year within the Wind River Reservation is justified by a compelling governmental interest in fostering and protecting the Eastern Shoshone Tribe's culture and religion. With regard to the asserted interest in fostering

and protecting the culture and religion of the Eastern Shoshone Tribe, Plaintiffs argue that the interest must be measured "through application of law to the particular claimant whose sincere exercise of religion is being substantially burdened." Doc. No. 79 (quoting *O Centro*, 546 U.S. at 430–31) (internal quotation marks omitted). From this, Plaintiffs argue that Defendants do not have a compelling interest in protecting the Eastern Shoshone Tribe's religious beliefs from offense.

In response, Defendants rely heavily on this Court's Order of November 5, 2012 to assert that they have a compelling interest in fostering and protecting the culture and religion of federally-recognized Indian tribes. From that general interest, Defendants argue they have a compelling interest in fostering and protecting the culture and religion of the Eastern Shoshone Tribe. As explained above, following this Court's Order of November 5, 2012, the Supreme Court decided *Hobby Lobby* and *Holt*. It would be clearly erroneous for this Court to ignore the effect of *Hobby Lobby* and *Holt* on determining what constitutes a compelling interest. Accordingly, the Court must examine those decisions as they relate to the asserted interest in fostering and protecting the culture and religion of federally-recognized Indian tribes.

The Tenth Circuit first considered the general interest in fostering and protecting the culture and religion of federally-recognized Indian tribes in *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002). In *Hardman*, the court heard three separate cases en banc. *Id.* Mr. Hardman, a non-Indian practitioner of a Native American religion, was convicted of possessing golden eagle feathers without a permit in violation of the Migratory Bird Treaty Act ("MBTA"). *Id* at 1118. Mr. Wilgus, also a non-Indian practitioner of a Native American religion, was convicted of possessing bald and golden eagle feathers without a permit in violation of the BGEPA. *Id.* at 1119. Mr. Saenz, "a lineal descendant of the Chiricahua Apache" but not a

37

member of a federally-recognized Indian tribe, was charged with violating the BGEPA for possessing eagle feathers without a permit. *Id.* at 1120. The charges against Mr. Saenz were later dropped but Mr. Saenz filed a motion for the return of his eagle feathers. *Id.*

Turning to the question of whether the government had a compelling interest in "preserving Native American culture and religion and pursuing the federal government's trust obligations to Native American tribes," the *Hardman* Court examined three possible bases for such an interest. First, the court considered the Indian Commerce Clause of the Constitution and concluded that "we have little trouble finding a compelling interest in protecting Indian cultures from extinction, growing from government's 'historical obligation to respect Native American sovereignty and to protect Native American culture.'" *Id.* (citing *Rupert v. Director, U.S. Fish and Wildlife Serv.*, 957 F.2d 32, 35 (1st Cir. 1992); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1216 (5th Cir. 1991)). Second, the *Hardman* Court considered the federal governments' trust obligation and Congress' plenary power over Indian affairs. *Id.* Ultimately, the Tenth Circuit concluded "the government's *general interests* in preserving Native American culture and religion in-and-of-themselves and in fulfilling trust obligations to Native Americans remain compelling interests." *Id.* (emphasis added).

Judge Murphy wrote a concurring opinion. In a footnote, Judge Murphy wrote that "[i]t is unclear from the majority opinion exactly what are the contours of the government's compelling interest in protecting Native American culture." *Id.* at 1138 n.3 (Murphy, J. concurring). In the view of the concurrence, the compelling interest lies in "guaranteeing members of sovereign and semi-autonomous Indian nations the ability to carry on their traditional way of life." *Id.* Judge Murphy further explained that "[i]f, however, the government's compelling interest lies in guaranteeing that members of sovereign and semi-

autonomous Indian nations have the ability to carry on their traditional ways of life, I fail to see how distributing eagle feathers outside of that class could ever 'foster' the government's interest." *Id.* In response to Judge Murphy, the majority stated the following:

> We agree that simply guaranteeing that Native American cultural practices are somehow a part of our modern culture is too cramped a view of the compelling interest, and we wish to dispose of any notion that such a view is advanced by this opinion, or by Supreme Court jurisprudence. We do not express an opinion on whether distributing eagle feathers to sincere adherents of Native American faiths irrespective of whether they were members of federally recognized tribes or not, or of Native American lineage or not, would foster or inhibit this compelling interest.

*Id.* at 1133 n.23 (majority opinion).

The *Hardman* Court remanded the cases for the lower courts to consider whether the regulatory scheme in the MBTA/BGEPA serves the government's compelling interests. *Id.* at 1136. Following remand, Mr. Wilgus's case returned to the Tenth Circuit in *United States v. Wilgus*, 638 F.3d 1274 (10th Cir. 2011). However, before the Tenth Circuit decided *Wilgus*, the United States Supreme Court decided *O Centro*.

In *O Centro*, a small religious sect sought an exemption from the Controlled Substances Act to drink "a sacramental tea, brewed from plants unique to the [Amazon Rainforest], that contains a hallucinogen." 546 U.S. at 423. The government argued that "it has a compelling interest in the uniform application of the Controlled Substances Act, such that no exception to the ban on use of the hallucinogen can be made to accommodate the sect's sincere religious practice." *Id.* The Court noted that RFRA adopted the compelling interest test from *Sherbert* and *Yoder*. *Id.* at 431. Then the Court explained, "[i]n each of those cases, this Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants." *Id.* Ultimately, the Court concluded that the broadly formulated interest in the

uniform application of the Controlled Substance Act was insufficient to qualify as a compelling interest based on the asserted harms posed by the religious use. *Id.* at 433–34.

In *Wilgus*, a panel of the Tenth Circuit, including Judge Murphy, revisited "the nature of the government's two compelling interests." *Wilgus*, 638 F.3d 1274, 1285. The *Wilgus* Court explained that the interest in protecting bald and golden eagles is straightforward but "[t]he second government interest—protecting and fostering Native American culture and religion—is considerably more complex." *Id.* Interestingly, while examining the second interest, the *Wilgus* Court did not consider *O Centro*. *See id.* at 1274–96. The court determined the interest in protecting and fostering Native American culture and religion from *Hardman* could be divided into two possible interests. *See id.* at 1285. It could be an interest in protecting and fostering the culture and religion of federally-recognized Indian tribes or it could be an interest in preserving Native American culture in-and-of-itself. *Id.* The *Wilgus* Court determined it was the former interest that controls. *Id.*

The court justified its determination on three separate grounds. First, the court determined that this interest is based on the federal government's "power to protect federally-recognized tribes." *Id.* at 1286. Second, the court determined that the interest in fostering and protecting the culture and religion of federally-recognized Indian tribes is consistent with the BGEPA. *Id.* The court explained that the use of the words "Indian tribes" creates the inference that "Congress saw the statutory exception not as protecting Native American religion qua religion, but rather as working to preserve the culture and religion of federally-recognized tribes." *Id.* Finally, the *Wilgus* Court explained that the interest in fostering and protecting the culture and religion of federally-recognized Indian tribes is consistent with Congress' plenary power. *Id.*

In *Hobby Lobby*, the Supreme Court considered whether closely held corporations could be required by the United States Department of Health and Human Services ("HHS") to provide health insurance coverage for methods of contraception that violate the sincerely held religious beliefs of the corporations' owners. 134 S.Ct. at 2759. The Court characterized HHS's asserted compelling interest as "couched in very broad terms." *Id.* at 2779. The Court explained its analysis with regard to the asserted compelling interests in the following way:

> RFRA . . . contemplates a "more focused" inquiry: It "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S., at 430–431, 126 S.Ct. 1211 (quoting § 2000bb–1(b)). This requires us to "loo[k] beyond broadly formulated interests" and to "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants"—in other words, to look to the marginal interest in enforcing the contraceptive mandate in these cases. *O Centro, supra*, at 431, 126 S.Ct. 1211.

*Id.* After identifying the issues and the rule, the Supreme Court declined to decide whether the asserted interests constituted compelling interests. *Id.*

In *Holt*, the Supreme Court considered whether a policy, which prohibited "inmates from growing beards unless they have a particular dermatological condition" was based on compelling interests when the petitioner sought "to grow a ½-inch beard in accordance with his religious beliefs." 135 S.Ct. at 859. The petitioner challenged the policy under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *Id.* RLUIPA and RFRA are closely related. *Id.* ("Congress enacted RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*, 'in order to provide very broad protection for religious liberty.'" (quoting *Hobby Lobby*, 134 S.Ct. 2751, 2760 (2014)). The respondents argued that the no-beard policy was justified by compelling interests in prison safety and security.

The *Holt* Court explained that determining whether the asserted interests in prison safety and security were compelling demands a "focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 863 (quoting *Hobby Lobby*, 34 S.Ct. at 2779) (internal quotation marks omitted). In evaluating the asserted interests, the Court stated the following: "We readily agree that the Department has a compelling interest in staunching the flow of contraband into and within its facilities, but the argument that this interest would be seriously compromised by allowing an inmate to grow a ½-inch beard is hard to take seriously." *Id.* at 863. The Court concluded that "it is hard to swallow the argument that denying petitioner a ½-inch beard actually furthers the Department's interest." *Id.* at 864. Ultimately, the Court did not answer the question of whether the policy furthers a compelling interest and instead determined that the no-beard policy is not the least restrictive means of furthering the asserted interests.

In light of *Hobby Lobby*, the Fifth Circuit recently questioned the Tenth Circuit's determination that the federal government has a compelling interest in fostering and protecting federally-recognized Indian tribes' culture and religion. *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 473 (5th Cir. 2014). The Firth Circuit explained that "we cannot definitely conclude that Congress intended to protect only federally recognized tribe's members' religious rights." *Id.* Significantly, the Fifth Circuit noted that *Hobby Lobby* may well change the Tenth Circuit's compelling interest analysis:

> [T]he Department and the Plaintiffs should have the opportunity to further develop the record on whether the protection of federally recognized tribes is a compelling interest protected by this statute. *See also Hobby Lobby*, 134 S.Ct. at 2779 (the governmental interest cannot be 'couched in very broad terms' but must be 'focused' on the particular claimant whose interest is substantially burdened).

*Id.* at 475.

Here, Defendants assert they have a compelling interest in fostering and protecting the culture and religion of the Eastern Shoshone Tribe and that interest prevents them from granting Plaintiffs a permit to take up to two bald eagles per year within the Wind River Reservation. Following the Supreme Court's recent guidance in *Hobby Lobby* and *Holt*, when determining whether Defendants' decision is justified by a compelling interest, the Court must look beyond the broadly formulated interest and scrutinize the harm of allowing the Northern Arapaho Tribe to take up to two bald eagles per year within the Wind River Reservation. In other words, the Court must ask whether Defendants' decision to restrict the Northern Arapaho Tribe from taking up to two bald eagles per year within the Wind River Reservation is justified by a compelling governmental interest in fostering and protecting the Eastern Shoshone Tribe's culture and religion.

The Court concludes that it is not. The asserted harm to the culture and religion of the Eastern Shoshone Tribe if the Northern Arapaho Tribe were to take up to two bald eagles per year within the Wind River Reservation is miniscule. There is no doubt that the federal government has "general interests in preserving Native American culture and religion in-and-of themselves and in fulfilling trust obligations to Native Americans." *See Hardman*, 297 F.3d 1116 (10th Cir. 2002). But the argument that taking up to two bald eagles per year within the Wind River Reservation would seriously compromise the federal government's general interest in protecting and fostering the Eastern Shoshone Tribe's culture and religion is unavailing. *See Holt*, 135 S.Ct. at 863.

In *Church of the Lukumi Babalu Aye*, the Supreme Court explained how a court must examine whether a facially discriminatory government action is justified by a compelling interest:

> Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling. It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.

508 U.S. at 546–47 (citation omitted) (internal quotation marks omitted). During the informal adjudication of Plaintiffs' permit application, the Eastern Shoshone Tribe explained its position to Defendants "that it opposed the take of eagles on the Wind River Reservation because bald eagles are sacred to the EST." R. at 530. As bald eagles are sacred to the Eastern Shoshone Tribe, then take of bald eagles, regardless of the location, would likely be an affront to the Eastern Shoshone Tribe's culture and religion. Pursuant to Defendants' decision, it is possible that Plaintiffs could take a bald eagle only one foot beyond the boundaries of the Wind River Reservation. If the Northern Arapaho Tribe were to take a bald eagle outside the Wind River Reservation, they would immediately bring that bald eagle back to the Wind River Reservation for use in their religious practices.

If take of two bald eagles within the Wind River Reservation harms the government's compelling interest in fostering and protecting the culture and religion of the Eastern Shoshone Tribe, then certainly take of two bald eagles one foot outside of the Wind River Reservation and bringing those eagles back to the reservation would produce "substantial harm or alleged harm of the same sort." *See id.* Yet, Defendants' decision to limit the area where Plaintiffs can take up to two bald eagles per year to Wyoming but outside the Wind River Reservation "leaves appreciable damage to that supposedly vital interest unprohibited." *See id.*

This Court finds that Defendants' decision to restrict Plaintiffs from taking up to two bald eagles per year to areas within Wyoming but outside of the Wind River Reservation is not justified by a compelling interest. Accordingly, the Court finds that Defendants made an error of law because the decision fails to satisfy the strict scrutiny under which it must be examined. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546 ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interest only against conduct with a religious motivation will survive strict scrutiny only in rare cases.").

### 3. Defendants' decision to exclude the Wind River Reservation from the area where Plaintiffs could take up to two bald eagles per year is not narrowly tailored to advance the asserted interest.

Finally, a facially discriminatory government action that burdens the exercise of religion must not only be justified by a compelling interest but it must also be narrowly tailored to advance that interest. *Id.* Plaintiffs and Defendants both made arguments regarding the least restrictive means test but did not address the question of whether Defendants' decision was narrowly tailored. As neither party made any cogent arguments regarding whether Defendants' decision was narrowly tailored, the Court will not examine this prong of strict scrutiny at length. However, some discussion is warranted.

In order to determine if a challenged government action is narrowly tailored in pursuit of the asserted interest, a court must examine whether the government action is substantially overbroad or substantially underinclusive. *See* 508 U.S. at 546; *see also Holt*, 135 S.Ct. at 865–67. In many respects, the narrowly tailored analysis mirrors the compelling interest analysis and the distinction between the two is not always clear. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *see also Hardman*, 297 F.3d at 1138 (Murphy, J. concurring) ("although the majority purports to analyze whether the permitting process furthers the government's interests

in protective Native American culture, the bulk of the majority's discussion . . . is actually directed to the analytically distinct question of whether the permitting process is the least restrictive means of advancing that interest."). For the present purposes, the Court notes that, as explained above, Defendants' restriction on the place where the bald eagles are taken fails to account for "other conduct producing substantial harm or alleged harm of the same sort." *Church of the Lukumi Babalu Aye*, 508 U.S. at 547. Accordingly, the Court finds that Defendants' decision in the informal adjudication of Plaintiffs' permit application was not narrowly tailored to advance the asserted compelling interest. As the Court finds both that Defendants' decision is not justified by a compelling interest and is not narrowly tailored to advance the asserted interest, the Court must hold unlawful and set aside Defendants' *Permit Findings* and *Renewal Permit Findings*.

## CONCLUSION

While the foregoing discussion is mired in legal nuance, at the end of the day, the federal government burdened one federally-recognized Indian tribe's free exercise of religion based on the religious objection of another federally-recognized Indian tribe. Whether the First Amendment prevents the federal government from imposing the burden of law on one federally-recognized Indian tribe's free exercise of religion for the benefit of another is a question of first impression, but it is clear that the First Amendment forbids such conduct—"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Church of the Lukumi Babalu Aye*, 508 U.S. at 542. The Court finds that Defendants' decision in its informal adjudication of Plaintiffs' permit application violated

the Free Exercise Clause of the First Amendment because the decision was not justified by a compelling governmental interest and was not narrowly tailored to advance the asserted interest.

The Court finds and that Defendants made an error of law when adjudicating Plaintiffs' permit application and that Defendants' error is capable of repetition, yet evading review. Therefore, this Court must set aside Defendants' *Permit Findings* and *Renewal Permit Findings*, and remand to the U.S. Fish and Wildlife Service to reconsider those findings consistent with this Order. "When an administrative agency has made an error of law, the duty of the Court is to correct the error of law committed by that body, and, after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law." *Miami Tribe of Oklahoma v. United States*, 656 F.3d 1129, 1138 (10th Cir. 2011). Accordingly, it is therefore

**ORDERED** that Defendants' *Motion to Strike Extra-Record Evidence* (Doc. No. 87 n.5) shall be, and is **GRANTED. It is further**

**ORDERED** that Plaintiffs' *Motion on Remaining Claims* (Doc. No. 79) shall be, and is **GRANTED IN PART** and **DENIED IN PART. It is further**

**ORDERED** that the U.S. Fish and Wildlife Service's *Findings for Northern Arapaho Tribe's Permit to Take Bald Eagles for Religious Purposes* (R. at 528–33) and *Findings for Northern Arapaho Tribe's Renewal Permit to Take Two Bald Eagles for Religious Purposes* (R. at 2278–94) are **REMANDED** to the U.S. Fish and Wildlife Service for reconsideration consistent with this Order.

Dated this 12th day of March 2015.

Alan B. Johnson
United States District Judge